SHAW, Judge.
A Jefferson County grand jury indicted Nathaniel Woods for four counts of capital murder for his involvement in the shootings of four Birmingham police officers. In case no. CC-04-4133, Woods was charged with intentionally causing the death of Carlos Owen by shooting him with a firearm while Owen was on duty as a police officer, in violation of § 13A-5-40(a)(5), Ala.Code 1975; in case no. CC-04-4134, Woods was charged with intentionally causing the death of Harley A. Chisolm III, by shooting him with a firearm while Chisolm was on duty as a police officer, in violation of § 13A-5-40(a)(5), Ala.Code 1975; in case no. CC-04-4135, Woods was charged with intentionally causing the death of Charles R. Bennett by shooting him with a firearm while Bennett was on duty as a police officer, in violation of § 13A-5^10(a)(5), Ala.Code 1975; and in case no. CC-04-4384, Woods was charged with intentionally causing the death of Carlos Owen, Harley A. Chisolm III, and Charles R. Bennett by one act or pursuant to one scheme or course of conduct by shooting them with a firearm, in violation of § 13A-5-40(a)(10), Ala.Code 1975. Pursuant to the State’s motion, the trial court consolidated the cases for trial.[1] The trial began on October 3, 2005, and on October 10, 2005, the jury found Woods guilty of all charges. The penalty phase of *5 the trial was conducted before the jury the following day, and the jury recommended, by a vote of 10 to 2, that Woods be sentenced to death. On December 2, 2005, the trial court held the final sentencing hearing. The parties presented evidence and argument for the court’s consideration, and the court took the matter under advisement. On December 9, 2005, the trial court accepted the jury’s recommendation and sentenced Woods to death. On January 3, 2006, Woods filed a motion for a new trial. On January 23, 2006, the trial court held a hearing on the motion, and it denied the motion that day.
The evidence adduced at trial indicated the following. Birmingham police officers Carlos Owen, Harley A. Chisolm III, Charles R. Bennett, and Michael Collins were on duty on June 17, 2004. Officer Collins testified that he was on patrol when he heard a radio transmission from Officer Owen, announcing that he was getting out of his patrol car on 18th Street at “the green apartments.” (R. 492.) Officer Collins was familiar with the apartments because they were in an area that had “been a drug problem area for years.” (R. 493.) The apartments were located four or five blocks from the police precinct. Officer Collins went to the green apartments to back up Officer Owen, and he parked behind the apartments a few minutes after he heard Officer Owen’s radio call. Before Officer Collins arrived, Officer Owen had been checking the license tags and the vehicle identification numbers of the vehicles located behind the apartments (R. 965-67), and he was standing near the back door of one of the apartments when Officer Collins arrived. Officer Owen told Officer Collins that a man at the back door had cursed at him and yelled at him and had told him to “get the fuck off his property.” (R. 495.) Officers Owen and Collins went to the back door of the apartment; Officer Collins testified that Nathaniel Woods was the man standing inside the doorway of the apartment. Woods then cursed at both officers repeatedly and told them to “[g]et the fuck off our property.” (R. 498.) Officer Collins saw a female in a white T-shirt behind Woods. Officer Collins testified that it appeared that a third person was also inside the apartment because someone pulled a window covering back and said “[f]uck the police” several times. (R. 501.)
Officer Collins testified that Woods told Officer Owen “[y]ou always hide behind that badge and gun,” and “[t]ake off that badge and I will fuck you up.” (R. 501.) Officer Owen then took off his badge, but Woods stayed behind the door. At that point, a female neighbor walked up to Officer Owen and called him by his nickname, Curly; after they spoke, Officer Owen put his badge back on and he and the female neighbor walked toward his patrol car. Officer Chisolm then arrived in his patrol car, and the other officers told him what had occurred. Officers Collins and Owen drove into the alley behind the apartments and spoke about the incident. Officer Owen said that the man at the door had told him that his name was Nathaniel Woods. Officer Collins checked Woods’s name using the in-car computer; specifically, he checked the City of Birmingham’s files in the event that Woods had been arrested in Birmingham, and he checked the National Crime Information Center (“NCIC”) files. The NCIC files indicated that a person named Nathaniel Woods, with an address in that area and of an age near the age Officer Collins estimated Woods to be, had an outstanding misdemeanor assault warrant from the City of Fairfield Police Department. However, Officer Collins testified that, at that point, he could not verify that the man in the apartment was the same person who had the outstanding warrant for his arrest.
*6 Officers Collins and Owen contacted Officer Chisolm by radio and asked him to go to the precinct to print out a picture of the person wanted by the Fairfield Police Department so they could determine whether that person was the person who had identified himself to Officer Owen as Nathaniel Woods. They also asked Officer Chisolm to contact the Fairfield Police Department to confirm that the warrant was still outstanding. Another officer later saw Officer Chisolm sitting at the NCIC computer at the Birmingham Police Department; he was printing a picture of a mug shot, and he had a printout of a “hit confirmation,” indicating that Nathaniel Woods had an outstanding warrant. Fairfield Police Department dispatcher Jackie Buchanan confirmed that a warrant for Woods had been issued on February 18, 2004, and that it remained outstanding. Officer Chisolm received a radio call from a Birmingham dispatcher at 1:17 p.m., informing him that the Fairfield Police Department had confirmed that the warrant was still active. Officer Chisolm then radioed the Birmingham dispatcher that he, Officer Owen, and Officer Collins would be leaving the precinct momentarily to try to arrest Woods. (R. 975.) Officer Chisolm radioed Officer Steven Sanders and told Officer Sanders that he had a suspect with an outstanding warrant who had been taunting the police, that is, standing inside a door saying, “You can’t get me. You can’t get me,” and then running back into the apartment. (R. 639-40.) Officer Sanders told Officer Chisolm that he would drive to the address on 18th Street to assist Officer Chisolm in serving the warrant, but that he was approximately 10 minutes from the address.[2]
While the police were confirming the validity of the warrant for Woods’s arrest, Woods remained at the apartment. Marquita McClure, Woods’s girlfriend, testified that in June 2004 she was living in the apartment with Woods, whom she called by the nickname “Nate.” Kerry Spencer, Woods’s codefendant in this case, also lived in that apartment, and McClure knew Spencer by his nickname, “Nookie.” Another young woman, Markesha Williams, was staying at the apartment and Spencer’s brother, Courtney, also occasionally came to the apartment. McClure testified that Woods and Spencer were close friends, and that the two sold drugs from the apartment. She testified that the pair used a “doorman,” someone who stood at the back door to look out for the police or to see if someone they did not know was trying to come inside. McClure also testified that guns were kept in the apartment; she saw long guns and revolvers, and she testified that Woods and Spencer carried the guns with them while they were in the apartment. McClure said that she saw Spencer walking around the apartment with a long gun strapped to his back on the day of the shootings, and she testified that the night before the shootings both Spencer and Woods were in the backyard shooting guns.
McClure testified that on the morning of the shootings, Woods had been outside but came inside and was standing at the screen door when Officer Owen drove up. She heard Woods and Officer Owen talking like they were angry, and when she walked into the room, she heard Woods tell Officer Owen to take his badge off. McClure said that Officer Owen took his badge off, and then the next-door neighbor came over and told Officer Owen to put his badge back on, which he did. The officers left soon after. While Woods and Officer Owen were talking, McClure said, Spencer was standing at the window of the back bedroom. After the police left, Woods and *7 Spencer said they did not like the police and they said, “I’ll kill the mother fuckers.” (R. 549.) She had on previous occasions heard Spencer make similar statements, but she did not pay attention when Woods or Spencer made these statements because she did not take them seriously.
McClure left the apartment to run an errand, and she asked Woods to come with her. However, Woods told her that he was going to stay with Spencer in ease the police came back. McClure said that when Woods walked her outside to the car, Woods was carrying his revolver. McClure did not return before the shootings took place.
Officer Collins testified that after the officers received confirmation from the Fairfield Police Department that the warrant against Woods was valid, he and Officers Owen and Chisolm drove to the green apartments to serve the warrant. As they arrived at Woods’s apartment, Officer Bennett arrived; Officer Collins said that he did not know how Officer Bennett was notified of their attempt to execute the warrant at the apartment. Officers Chi-solm and Bennett went to the front of the apartment, and Officers Collins and Owen went to the back of the apartment. Officer Collins testified that, as he and Officer Owen walked toward the back door, a man who had been working on one of the vehicles parked near the apartment walked away and said, “I don’t want no part of this. I don’t want nothing to do with this. I don’t want no part of this.” (R. 650.) Woods was again standing inside the screen door, and he immediately began cursing and telling the officers to “get the fuck out” of there. (R. 650.) Officer Owen told Woods that they had a warrant for his arrest on a misdemeanor assault charge from Fairfield and that he needed to step outside. Officer Collins said that Woods refused to come outside and that he responded to Officer Owen’s request by saying, “Fuck you. I don’t have no warrant. Fuck you.” (R. 651.) Woods repeatedly stated that there was no outstanding warrant for his arrest, and he demanded to see the warrant. The officers then called Officer Chisolm on the radio and asked him to come to the back of the apartment with the picture and the NCIC printout. Officer Chisolm walked around to the back of the apartment and showed Woods the mug shot and the NCIC printout, but Woods continued to argue that he had “no papers,” i.e., that a warrant had not been issued. Officer Chi-solm told him that he was under arrest and to step outside. Officer Collins testified that Woods told the officers that “[i]f you come in here, we’ll fuck you up.” (R. 694.)
Officer Collins testified that, all of a sudden, Woods turned and ran from the kitchen further into the apartment. Officer Chisolm grabbed the screen door, opened it, and followed Woods inside the apartment. Officer Owen then went into the apartment; Officer Collins followed behind him. None of the officers had their weapons drawn when they entered the apartment. Officer Collins testified that when he stepped into the kitchen of the apartment, he saw that Officers Chisolm and Owen were in the doorway between the kitchen and the living room and they appeared to be holding Woods. He could hear Woods say, “Okay. I give up. Just don’t spray me with that mace.” (R. 654.) Officer Collins then heard someone radio that “[t]hey are coming out the front door.” (R. 656.) Officer Collins testified that Officers Chisolm and Owen had the doorway blocked, so he turned and ran toward the back door so that he could join Officer Bennett at the front door. As he turned, Officer Owen said to him, “ ‘Mike, they are going out the front.’ ” (R. 656-57.)
*8 Officer Collins testified that, as he got to the back door, he heard “a little shuffling behind me and shooting started.” (R. 657.) He heard numerous shots and he felt a slapping sensation on his leg by his holster. Officer Collins testified that he ran toward the back of his patrol car for cover. He twice radioed the dispatcher that shots had been fired. From his position behind his patrol car, Officer Collins radioed a “double aught” call, a seldom-used radio code meaning that an officer needs all possible assistance because his life is in danger. Officer Collins saw Kerry Spencer standing at the doorway of the apartment shooting in his direction; he could hear the bullets hit the vehicle, and he could hear glass shattering. Several other officers then arrived at the scene. Later that afternoon, Officer Collins discovered that his holster had a hole in the side, as did his pants, and that he had sustained an injury to the back of his upper right thigh. He found a metal fragment in the lining of his pants pocket near the hole in his pants.
Carolyn Lavender, a sergeant with the Birmingham Police Department assigned to communications, testified about the radio transmissions among several of the officers and dispatchers on the day of the shooting. Sgt. Lavender testified that a dispatcher contacted Officer Chisolm at 1:17 p.m. and notified him that the Fair-field arrest warrant on Woods had been confirmed. Officer Chisolm notified the dispatcher that he and Officers Owen and Collins would be leaving the precinct soon to try to arrest Woods on the warrant. The next radio transmission involving Woods came at 1:24 p.m., from an unidentified officer who stated, “They are going out the front.” (R. 975.) Two seconds later a transmission of “[sjhots fired” was made; another “[s]hots fired” transmission ?was radioed four seconds after that. (R. 975-77.) At 1:25 p.m., Officer Collins radioed “double aught.”
Several officers who responded to the double-aught call testified at trial. Officer Hugh Butler testified that he was less than a mile from the green apartments when he heard the call. When he arrived, he saw that another officer was already at the scene and was standing to the side of the front door, armed with a shotgun. When Officer Butler walked toward the front door, he saw Officer Bennett on the ground, face up, “obviously dead with a hole in his face and smoke coming out if it.” (R. 708.) As he ran up to the doorway, he looked behind him and noticed that Officer Terrance Hardin and another officer had arrived. One of the officers called out that there was a weapon in the grass; that weapon was an SKS assault rifle with a magazine attached. Officer Hardin picked up the assault rifle and secured it in Officer Butler’s patrol car. Officer Butler called into the apartment for Officer Owen and Officer Chisolm, but he received no answer. He called for anyone else in the apartment to surrender, but received no response to that directive. He and several other officers then entered the apartment. Officer Butler testified that he saw Officers Owen and Chisolm and that they were dead. When Officer Fred Alexander saw Officer Bennett outside the apartment, he radioed dispatch to report that an officer was down. When Officer Alexander saw that Officers Owen and Chisolm were dead, he radioed dispatch to advise that two other officers were down. The officers found a handgun in the bathroom and two long guns, one with the stock sawed off, in a bedroom. After the officers cleared the apartment and determined that no one else was inside, they then went outside and found Officer Collins. Sgt. Ruben Parker, who was retired at the time of trial, testified that he and Officer J.D. Gray responded to *9 the double-aught call, and they kept a perimeter around the scene when they arrived. Sgt. Parker said that another officer was near Officer Bennett’s body and noticed a Glock brand gun that was 6 to 12 inches from Officer Bennett’s right hand. Sgt. Parker kept the gun until he turned it over to an evidence technician.
Many officers canvassed the neighborhood after the shootings. Sgt. Daniel Carr, who was retired at the time of trial, testified that he came upon a house where three black males were sitting on the porch. He testified that one of the men was Woods, and he said that Woods appeared to be very relaxed as he sat on the porch and spoke with the officer. After Sgt. Carr confirmed by looking at a photograph that the man looked like one of the suspects, he asked Woods for his name and Woods gave Sgt. Carr his full name. Woods was taken into custody. When Woods was patted down, the officers found no identification on him, but they found two .22 caliber bullets in a pants pocket. At 2:56 p.m., an officer radioed that Woods was in custody. (R. 977-78.)
Sgt. James Blanton testified that on the day of the shootings, he was working in the vice-narcotics division of the Birmingham Police Department, but when he heard the double-aught call, he and his partner closed their operation and responded to the location of the shooting. After completing some searches of houses in the area, he was informed that a suspect was in a residence at a certain address on 18th Street. Sgt. Blanton arrived at that residence and he saw his partner attempting to coax Kerry Spencer out of the attic. Sgt. Blanton said that he and a detective saw Spencer’s hands moving toward them, so they reached into the attic and pulled Spencer out.
Fernando Belser, whose nickname is “Blue,” was inside the apartment when the officers were shot and killed. Belser testified that he had been staying at the apartment on 18th Street with Woods and Spencer for three or four months. He said that Woods’s girlfriend, Marquita McClure, and Spencer’s girlfriend, Marke-sha Williams, were also staying at the apartment in June 2004. Belser testified that Woods and Spencer made money by selling drugs from the apartment and that he was the “doorman” at the apartment. He stated that a “doorman” determines who gets to come inside to purchase drugs and handles most of the transactions of money and drugs between the purchaser and drug dealer. According to Belser, drug purchasers would come in the back door of the apartment, and were generally not permitted past the kitchen into the living room unless Woods or Spencer gave them permission. Belser testified that “[i]f somebody tried to go past the— through the kitchen into the living room without permission, or if they tried to go and they were being told to stop in the kitchen, they would probably, you know, get hurt pretty bad or something could happen to them .... ” (R. 754.) Belser testified that Woods and Spencer were the primary purveyors of drugs in the apartment and that they sold mostly crack cocaine. On an average day, Belser said, Woods and Spencer sold drugs to 100 to 150 customers and a lot of money flowed through the apartment.
Belser testified that handguns and shotguns were kept in the apartment and that Woods and Spencer carried guns on them. Woods typically carried a small handgun, but Spencer carried all kinds of guns, including an assault rifle. Belser testified that he first saw the SKS assault rifle used in the shooting the night before when Spencer test-fired it outside the apartment. Belser testified that, before the day of the shootings, he had heard Spencer say *10 that he did not like the police, that he was tired of them harassing him, and that if they did not stop harassing him, he would “light them up,” meaning that he would shoot them. (R. 762.) Belser also said that he had heard Woods make statements similar to those Spencer had made.
Belser testified about the police officers’ first stop at the apartment on June 17, 2004; that testimony was substantially similar to that given by other witnesses. Belser left the apartment after the officers did, and he was gone for an hour or two. After he returned, the police came back a second time. According to Belser, Woods was standing inside the screen door at the back of the house when Officers Owen and Chisolm arrived in the back. He heard Woods and Officer Chisolm discussing a warrant, then Woods began to “retreat, backpedal” into the living room. (R. 771.) Belser said that Officer Chisolm then snatched the screen door open and came inside the kitchen. Officer Chisolm walked just past the threshold between the kitchen and the living room, shaking a can of Mace, and Woods told Officer Chisolm not to spray him with the Mace. Belser testified that he did not see Officer Chi-solm spray the Mace; that he did not cough or smell anything; and that Woods was not coughing. At that point, Belser said, Spencer came out of the bedroom carrying the SKS assault rifle that was later recovered in the yard of the residence. Belser said that Spencer opened fire on Officer Chisolm and Officer Chi-solm tried to return to the kitchen. Belser did not look toward the kitchen anymore after Spencer began shooting but knew that Spencer fired several shots into the kitchen and out of the back of the apartment. (R. 813-14.) Woods tried to go out of the front door, Belser said, but when Woods opened it, Woods told Spencer that they had “another one right there.” (R. 778.) Because the front door opened inward, Belser’s view was blocked, and he could not see anyone outside. Spencer turned and fired shots out the front door. Belser testified that Woods then ran out the front door and that Spencer followed him within seconds; the pair ran across the street. Belser walked to the front door and saw Officer Bennett on the ground; the shooting had stopped, he said, and he stepped over the officer’s body and walked down the street.
On cross-examination, Belser acknowledged that he had previously pleaded guilty to felony charges of possession of a forged instrument. He continued to maintain that Spencer and Woods had expressed that they were tired of the police messing with them and that he had heard Spencer say that he would “light them up” and that Woods agreed with Spencer. However, when Belser was asked whether he could determine whether Spencer and Woods were serious when they made such remarks, Belser replied that it was hard to say with Spencer. He added that it was “just hard to say if he meant it or not because he kept a certain demeanor. He be — seems like he was dead serious, but he would be joking. And then you would think he was joking, but he would be dead serious_” (R. 803-04.) Belser also testified that if he had believed that Spencer and Woods intended to shoot police officers, he would not have stayed at the apartment. Finally, Belser testified that, when Woods opened the front door and announced there was “another one,” he did not tell Spencer to shoot him; instead, Belser said, when Woods opened the door and saw the other officer, “it scared him.” (R. 815.)
John Prather testified that he lived in a four-room house commonly known as a “shotgun-style house” located on 18th Street in Ensley at the time of the shooting. He said that he was familiar with the *11 green apartments and could see them from his house. On the day of the shooting, he was watching television in the middle room of the house, the bedroom; two acquaintances were also in the house, a young woman named Marshay and Michael Scott. Prather testified that he heard many sirens that afternoon and, suddenly, two men kicked open his back door. He identified Woods as one of the men and said that Spencer was the second man. According to Prather, Woods and Spencer came into his bedroom and sat down; Spencer sat to his right and Woods sat to his left, near a heater. Prather said that he was concerned for his safety, and he asked Woods and Spencer what was going on. They told him that he would be taken care of when it was all over, and he knew they were talking about paying him, though no specific dollar figure was mentioned. Prather said that he overheard Woods tell Spencer, “You came through for me.” (R. 842.)
Prather testified that he became restless after he saw reports on the television involving the three officers being shot at the green apartments, and he knew that Woods and Spencer were involved. Although he was very apprehensive about getting up, Prather said, he eventually got up and walked out of the bedroom and into the living room. Prather then walked out of his house and sat on the porch of the house next door. According to Prather, Woods followed him and sat on the steps at the house next door. Police were all around the area. After approximately 10 minutes, Prather walked back to his house and sat on the banister of his porch; Woods followed him and sat on the steps of his porch. Prather testified that a police officer walked over and spoke with Woods, and Woods gave the officer his name and surrendered. Finally, Prather testified that when Woods first burst into his house, he did not appear to have a hard time breathing, and his eyes had no tears and his nose was not running.
Michael Scott testified that he was in Prather’s house, which was approximately one block from the green apartments, when he heard shots fired. He admitted that he had previously been inside the green apartments to purchase cocaine; he said he had purchased drugs approximately 10 times from Woods and Spencer. After he heard the shots fired that day, he yelled to Prather, and he then heard a commotion in the back of the house. Scott said that he turned and saw Woods and Spencer come through the back door of Prather’s house. Woods walked into the living room where Scott was standing. Woods was not coughing and he had no trouble breathing, Scott said; Scott also said that Woods had no tears and his nose was not running. Woods said, “They fucked with the wrong niggers. We shot their asses” (R. 860), and then said something about having been sprayed with Mace. According to Scott, Woods then went into the bedroom with Prather and Spencer. When Prather came into the living room and suggested to Scott that they go outside, he turned to see where Spencer had gone and heard a commotion in the attic, so he assumed that Spencer had climbed into the attic. Scott said that a police officer eventually came to the porch and recognized Woods from a photograph he was holding, and that Woods was taken into custody.
Officer Cedric Clifton testified that he was working in the evidence-technician unit of the Birmingham Police Department on June 17, 2004, and that he photographed the scene and collected evidence at Prather’s house. Officer Clifton testified that he collected a wallet from beneath the couch in the living room that contained Woods’s identification card and Social Security card, among other things. *12 He also found a 9mm handgun in the attic of the residence next to the entryway to the attic. The gun was loaded, and it had 1 round in the chamber and 10 rounds in the clip. Officer Clifton testified that in the bedroom, behind the heater, he recovered a second handgun, a Beretta brand 9mm gun. Officer Clifton testified that “[t]he weapon had been hit right behind where you pull the trigger,” and that he was not able to remove the magazine from the weapon as a result of the damage. (R. 945.) Subsequent testimony established that the Beretta handgun found behind the heater in Prather’s house was Officer Owen’s service weapon. (R. 944, 1194.) Officer Clifton was unable to locate any fingerprints on the weapon.
Evidence technicians and a crime-scene investigator photographed and diagramed the scene where the shooting occurred and collected evidence from the apartment, in the front and back yards, and in a nearby vacant lot. The officers testified that they collected numerous weapons, shell casings, spent bullets, and live ammunition from the scene. Finally, Officer Chester White, an evidence technician, testified that he received a Glock 19 9mm semiautomatic weapon from Sgt. Ruben Parker. That gun had been located near Officer Bennett’s body and was identified as his service weapon. Officer White testified that the gun was fully loaded. Officer White also received the SKS assault rifle that had been found in the front yard of the residence; two live rounds remained in the assault rifle. Three loaded weapons — a shotgun, a rifle, and a revolver — were also recovered from other rooms in the apartment. Officer White photographed the bodies of the deceased officers and removed their duty belts and items from their pockets. Officer Owen had no weapon on his duty belt, and the gun holster on the belt had been damaged. When he Collected Officer Chisolm’s duty belt, Officer White noted that the holster that usually contained a Mace canister was empty and that the canister of Mace was located near the back door of the apartment. Officer White testified that, after he received information from the coroner about the gunshot wound to Officer Bennett’s face, he returned to the scene and dug a bullet from the ground beneath where Officer Bennett’s head had been lying.
Charles Underwood, an investigator in the forensics unit of the Birmingham Police Department, testified that he photographed the backyard of the apartment and collected shell casings there. He observed bullet holes in Officer Collins’s patrol car — in the radiator, the windshield, and the strobe light bar of the car — and bullet holes in another car parked behind the apartment. A vehicle in front of the apartment had bullet holes in the front fender and in the hood. Inv. Underwood collected bullet fragments from inside Officer Collins’s patrol car and from the car parked in front of the apartment. Inv. Underwood also collected two spent shell casings from the front yard near Officer Bennett’s body. Finally, Inv. Underwood testified that he conducted a trajectory examination of the cars so that he could determine the path the bullets took when they were fired and where the barrel of the gun was in relation to where the shots were fired.
Dr. Gary Simmons, a forensic pathologist with the Jefferson County Coroner’s Office, testified that he conducted the autopsies on the three officers. He provided details of the examinations of each officer’s body, and concluded that each had died of multiple gunshot wounds. Dr. Simmons testified that Officer Chisolm and Officer Owen sustained several gunshot wounds to the back that then exited the front of the body; that the stippling on the skin indicated that when the bullet was fired into *13 Officer Bennett’s face, the gun was 12 inches or less from him; and that one of the bullets fired at Officer Chisolm was fired from less than two feet away. Dr. Simmons testified that the more serious wounds the officers sustained, as opposed to the graze wounds, were typical of those caused by high-powered rifles because the bullets left large holes in the bodies, particularly as the bullets exited the bodies. Dr. Simmons recovered bullet fragments from each officer’s body and secured them for further analysis. Dr. Simmons testified that Officers Chisolm and Bennett were wearing bulletproof vests, but he noted that several bullets went through the vests because those vests are typically made to stop bullets from handguns, not from high-powered rifles.
Mitch Rector, a firearm-and-toolmark examiner with the Birmingham Police Department, testified that he examined the weapons, bullet fragments, and shell casings recovered in this case. He identified numerous shell casings and bullets that had been fired from the SKS assault rifle recovered at the scene. Rector testified that some of the bullet fragments recovered during the autopsies of Officers Bennett and Chisolm had been fired from the SKS assault rifle. The fragments recovered from Officer Owen’s body were similar to the type of bullet fired from the SKS assault rifle, but he could not state conclusively that the fragments were from a bullet fired by the SKS assault rifle he tested. Rector testified that he examined the officers’ weapons and that Officer Bennett’s weapon and Officer Chisolm’s weapon functioned normally, but that Officer Owen’s firearm had a large defect in the metal near the trigger guard that severely damaged the gun and rendered it inoperable. In addition, the holster on Officer Owen’s duty belt was damaged, and Rector testified that the damage to the gun and holster were typical of what he would expect if they had been struck by a high-velocity bullet such as one fired by an SKS-type rifle. Rector also found that a portion of a bullet had been left inside Officer Owen’s holster, and he stated that the appearance of the bullet fragment was consistent with what is commonly found in SKS ammunition. None of the shell casings recovered at the scene had been fired from any of the officers’ weapons. Finally, Rector testified that he conducted a distance study regarding the gunshot wound to Officer Bennett’s face to determine how far the muzzle of the SKS assault rifle was from his face when it was fired. He determined that the end of the barrel of the SKS assault rifle was from two to six inches from the officer’s face when it was fired.
Greg Parker testified that on December 4, 2003, before the shootings in this case, he was employed as a police officer by the City of Fairfield. While he was assisting other officers who were attempting to serve a warrant, Woods — who was not the person the officers were looking for — came from behind the residence and walked toward him. Officer Parker said that Woods was wearing a long trench coat, that he had his hands in his pockets, and that he looked suspicious. Officer Parker told Woods to remove his hands from his pockets because his job made him suspicious of people with their hands in their pockets because they might have a firearm; Officer Parker also told him that a sudden movement could get him shot. Officer Parker said that, in response, Woods “said he could have shot me.” (R. 1308.) Officer Parker asked Woods if he had a gun, and Woods said he did, so Officer Parker and the other officers restrained him. The officers removed from Woods’s pants what appeared to be an operational handgun but was actually a pellet gun. Woods was arrested on a charge of menacing.
*14 William Powell, a Jefferson County deputy sheriff assigned to the jail, testified that when Woods was in jail on December 14, 2004, after the shootings in this case, he closed the door of Woods’s cell, and Woods called him derogatory names and then told him that he was “hiding behind [his] badge just like the other three mother fuckers.” (R. 1318.) Woods also told Deputy Powell that if he won his case and was released, he was going to come looking for him. Deputy Powell filed a report on the incident.
Deputy Vince Gillum testified that he was employed by the Jefferson County Sheriffs Office and that he was assigned to the jail. He stated that, on June 22, 2005, he observed contraband on the wall of Woods’s cell — a drawing pasted to the wall — so he removed it. The drawing was admitted into evidence, and we have examined it. The drawing depicts two men shooting firearms. One man is shooting an assault rifle and three flaming skulls are depicted in the blasts from that weapon, and the other man is shooting two handguns. The drawing contains a heading at the top, “NATE $ NOOKIE,” and depicts street signs at an intersection of “18th Street and Ensley.” When Deputy Gillum removed the drawing, Woods said that the drawing was his and that he wanted it back.
Deputy Sheriff Tonya Crocker testified that she was also assigned to the jail and that on July 29, 2005, she searched Woods’s cell. She found some broken razors and some drawings that concerned her. After obtaining a search warrant, Deputy Crocker seized several items from .the bunk where Woods slept. The items included a handwritten document and two copies each of two separate drawings depicting “Nate” and “Nookie” shooting on 18th Street. One of the drawings depicted flaming skulls coming from the blast of what appears to be an assault rifle and the other drawing depicted a police car with many bullet holes in it.
Detective Phillip Russell of the Birmingham Police Department testified that the trial court had ordered Woods to provide handwriting samples, so he obtained those samples from Woods using the procedure he had been instructed to use by the handwriting analyst who would later examine the samples. Det. Russell was instructed to have Woods repeatedly rewrite the words on the document found in his cell. We have reproduced those words exactly as they appear on the document:
“Seven execution styles murders I have no remorse because I’m the fue-kin murderer
Haven’t you ever heard of a killa I drop pigs like Kerry Spencer So when I walk around strapped One time bust the caps and watch pigs elapse
Snapp, adapt to this because I needs no adapter
this is just the first chapter.”
(State’s Exhibit 337-A.) Det. Russell testified that the document appeared to be an adaptation of the lyrics of a rap-style song by an artist named Dr. Dre, which he located by an Internet search.
Steven Drexler testified that he had recently retired from the Alabama Department of Forensic Sciences, where he had been with the questioned document and handwriting unit. He testified that he compared Woods’s known writing samples that were obtained by Det. Russell with the writing on the document obtained during the search of Woods’s cell. Drexler testified that, in his opinion, the document was written by Woods.
Woods presented several witnesses in his defense. Markesha Williams testified that she had known Kerry Spencer for *15 about five days and that she had visited Spencer at the green apartments. She was at the apartment on the day of the shooting. Williams testified that, when the officers first came to the house, she heard Woods and Spencer talk back and forth with the police. She stated that Spencer told an officer that if the officer took his badge off Spencer would come outside, so the officer took his badge off, but Spencer remained inside. She said that the police left after approximately 10 minutes. She testified that, after the police left, Woods said that if the police kept coming back he was going to shoot them but that she did not take him seriously. Later, Williams saw two police cars drive down the back alley. She went into the living room, and Woods was standing at the screen door. When the two officers came to the door, Williams said, Woods asked them why they kept coming back “messing with 'em.” (R. 1451.) Williams testified that after Woods and the police argued, the officers “snatched the door off the hinges,” wrestled Woods to the ground, and beat him. (R. 1452.) She said that she did not see anyone spray Mace; that she has asthma; and that she would have gotten sick if she had smelled or been around Mace. Williams testified that Courtney Spencer woke up his brother, who was sleeping; that Kerry Spencer went into the bedroom and looked out the window; and that he returned to the living room and grabbed the gun. Spencer said something to the police and then started shooting. Williams said that a third officer opened the front door, and Spencer shot him. She testified that Woods got up off the ground after the shooting started and that he was panicky. Williams testified that Woods did not open the door and he did not tell Spencer that another officer was at the front door. She said that she was the first person to run from the apartment after the shooting; that she did not see Woods or Spencer running from the apartment; and that she did not see who shot Officer Bennett in the face. Williams acknowledged that, when she gave a statement to the police after the shooting, she had said that based on what she had heard Woods and Spencer say after the police left the first time, she knew there would be a confrontation if the police returned, and that when the police officer asked if Woods and Spencer had planned the confrontation, she told him that it was planned. However, at trial, she testified that what she meant by her statement was that she expected a verbal confrontation, and that she did not expect anyone to shoot a police officer.
Brandon Carter, an inmate, testified that he knew Woods from being incarcerated with him. He identified some of the drawings removed from Woods’s cell during the search and testified that he had copied them from the original and had given the copies to Woods. Carter testified that Woods did not ask him to draw the pictures for him.
Travis Dumas, also an inmate, testified that he, like Fernando Belser, had worked as a “doorman” at the apartment from which Woods and Spencer sold drugs. He testified that he was at the apartment during the morning of the shooting and that he was awakened by someone kicking the front door. According to Dumas, Woods went to the front door and argued back and forth with the person. Dumas said that he recognized the voice of the person as Officer Owen’s voice because Officer Owen had been patrolling his neighborhood for many years. He heard Officer Owen tell Woods that he would be back. Dumas said that while Woods argued with Officer Owen at the front door, Spencer was arguing with officers at the back door; Dumas recognized Officer Chi-solm as one of the officers at the back *16 door. After the police left, Dumas heard Spencer say that if the police came back, he was going to “bust 'em,” meaning he was going to shoot them. (R. 1503.) Dumas said that he did not take Spencer’s comment seriously because he had heard other people talk about shooting the police before and he had said it himself. Dumas testified that he left the house to steal items from a grocery store nearby, and that after he “stole a whole bunch of everything,” he tried to return to the apartment but he could not because the police were everywhere. (R. 1504.)
Woods also called codefendant Kerry Spencer to testify on his behalf; Spencer invoked his Fifth Amendment privilege and refused to testify. However, the trial court permitted the attorneys for the State and for Woods to read into the record Spencer’s testimony from his own trial.[3] At his trial, Spencer admitted that he sold drugs from the apartment where the shooting occurred. He testified that he bought the SKS assault rifle the night before the shooting, and that he had test-fired it in the backyard. On the day of the shooting, Spencer said, Officer Owen kicked the front door of the apartment early in the morning, between 6:00 a.m. and 8:00 a.m. He and Woods looked out the window and recognized the officer. Spencer said that Officer Owen returned to the apartment later that morning, parked in the backyard, and said something to Woods, who was standing at the back door, about stolen cars. Woods cursed at Officer Owen repeatedly, Spencer testified, and told him to get off the property. Spencer said that he went to a window in the bedroom and also cursed at Officer Owen; he told the officer to “get his weak ass the fuck on.” (R. 1548.) He said that Officer Owen told him that he had enough body bags for him too. According to Spencer, Officer Collins then drove into the yard and Officer Owen spoke to him. Officer Owen returned to the back door and tried to get him and Woods to come outside, but they continued to curse at him. Woods told Officer Owen that he hid behind his badge; Spencer said he agreed with Woods and told Officer Owen that if he took his badge off, they would come outside. Officer Owen then took the badge off and told them to come out, but they refused. Spencer said that a female neighbor then walked over and told Officer Owen to stop acting like that, and he put his badge back on and left soon after. Before he left, Spencer said, Officer Owen said he would be back when he got off work.
Spencer testified that he then heard Woods speaking to someone and he saw that Woods was speaking to Officer Chi-solm. Spencer said that he told the officer that he needed “to get the fuck away from the apartment. That he a fuck boy.... Basically just telling him get the fuck on.” (R. 1555-56.) He said that Officer Chi-solm let them know that the police would be back and led Spencer to believe that he would be killed when they returned. Spencer said that he was in fear for his life. Spencer also said that neither he nor Woods gave their names to either of the officers.
Spencer testified that he was asleep on the couch when the officers returned; the SKS assault rifle was beside his leg. He said that he heard a snap and got up and went into the bedroom so he could look out the window. Spencer stated that he saw the police cars outside and that he then heard a struggle, but that he did not know *17 the police were in the house. Spencer said that when he came out of the bedroom, Woods was coming out of the kitchen holding his face as if he were in pain; that he heard something beside him; and that, as he turned around, he saw Officer Chisolm raise his gun so he opened fire. (R. 1571.) Spencer said that he believed that the officer was going to shoot him and that he had no alternative but to fire his weapon. Spencer fired until Officers Chisolm and Owen were down. Spencer said that the front door then opened and that he saw Officer Bennett with a gun, so he shot him.
Spencer said that he did not know if other officers were in the front of the apartment, so he went toward the back door. He saw Officer Owen’s gun on the floor beside him, and he took the gun because he did not want to be shot. He opened the back door and saw Officer Collins standing outside the apartment; Officer Collins took a few steps toward him with his gun in his hand. Spencer testified that he walked out of the apartment and that he and the officer looked eye-to-eye, and that the officer then ran behind his patrol car. Spencer said that he waited until Officer Collins was behind the car and then he fired a couple of shots into the windshield. He said that he could have shot and killed Officer Collins, but that he had no reason to because the officer posed no threat to him. Spencer stated that he then went to the front door and cautiously walked outside, holding the gun at his side, pointing down. While he was standing next to Officer Bennett, Spencer said, the officer’s hand “jumped and touched me, you know, and automatically, reflex, you know, I quickly shot.” (R. 1575.) After he shot Officer Bennett at close range, he threw the gun down and ran to a neighbor’s house. Spencer testified that he did not intend to kill any of the police officers but that he did what he had to do to avoid being shot and to stay alive. However, on cross-examination, Spencer acknowledged that in a prior statement to the police, he had said that he shot the officers because he was “pissed off.” (R. 1599.)
In addition to Spencer’s testimony from his trial, the testimony of Randall Washington, who was declared an unavailable witness, from Spencer’s trial was also read into evidence at Woods’s trial. Washington testified at Spencer’s trial that he was in the backyard of the apartment working underneath Courtney Spencer’s car when the police arrived to arrest Woods. He heard someone say, “They’re back.” (R. 1639.) While the police were walking toward the apartment, Courtney Spencer raised his hand and said, “ T don’t have anything to do with this. I’m just over here getting my car worked on,’ ” and he walked away. (R. 1624.) Washington said that he stayed under the car because he had an outstanding warrant for his arrest for unpaid fines, and he did not want to be arrested. Washington heard Officer Owen say to someone at the back door that he had a warrant; Officer Owen said this to the person more than once. Washington next saw another officer walk around from the side of the apartment at a fast pace toward the screen door. Washington said that he then heard a snap and saw the police officer snatch open the screen door and enter the apartment. A second officer followed him, Washington said, but he did not see a third officer. Washington testified that, one to three minutes later, he heard gunshots. He stayed beneath the car until the shooting stopped, then he ran away.
In rebuttal, the State recalled Det. Phillip Russell. Det. Russell testified that, when Spencer gave his statement to the police on the afternoon of the shooting, he admitted that he had killed the three officers, but, contrary to his testimony at his trial, he repeatedly denied taking Officer *18 Owen’s gun. Det. Russell also testified that Spencer did not say in his statement, as he did at his trial, that he was the one who shot Officer Bennett in the face. Finally, Det. Russell testified that he had asked Spencer where Woods was while Spencer was shooting, and Spencer said, “ ‘Nate had — he was running with me.’ ” (R. 1643.)
On appeal, Woods raises several issues, many of which he did not raise by objection in the trial court. Because Woods was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
Rule 45A, Ala. RApp. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
“Plain error” has been defined as error “ ‘so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ ” Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that “ ‘[t]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ ” Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).
I.
Woods contends that the trial court erred when it admitted testimony from several witnesses about Woods’s collateral bad acts. Specifically, he argues that the trial court erred when it permitted Officer Collins to testify that he searched the City of Birmingham’s computerized files for Woods’s name; when it permitted witnesses to testify about Woods’s selling drugs from the green apartments and having guns in his possession there; and when it admitted State’s Exhibit 332, a drawing of men shooting on 18th Street that was removed from the wall of Woods’s cell, and State’s Exhibit 333, the lyrics Woods wrote. Woods argues that the evidence was improperly admitted as character evidence in violation of Rule 404, Ala.R.Evid., that it was irrelevant and prejudicial and thus admitted in violation of Rules 401 and 403, Ala.R.Evid., and that it was admitted without a limiting instruction to the jury.
Rule 404(b), Ala.R.Evid., provides, in pertinent part:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, *19 identity, or absence of mistake or accident
Even if the evidence of a collateral bad act fits into an exception to the general exclusionary rule, the trial court must determine whether the evidence is relevant and probative, Rule 401, Ala.R.Evid., and whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, Rule 403, Ala. R.Evid.
The State provided notice before trial to Woods that it intended to introduce certain evidence pursuant to Rule 404(b), Ala. R.Evid., including an arrest warrant from the Fairfield Police Department. Woods filed an objection to the State’s motion and filed several motions in limine in which he sought to preclude admission of, among other things, the drawings and writings seized from his jail cell and several statements he had made before the shooting. The trial court reserved ruling on a majority of the motions until it had heard some of the evidence at trial. Before the State offered the collateral-act evidence at trial, the trial court held a hearing outside the presence of the jury and permitted the parties to present their arguments to the court about each piece of evidence the State intended to introduce pursuant to Rule 404(b). The trial court sustained several of Woods’s objections and admitted other evidence offered by the State. The court informed the parties that it would instruct the jury about the limited purpose for which the evidence was offered, and the record reflects that the trial court instructed the jury several times during the trial, including in its oral charge to the jury, about the limited purpose for which the evidence was being offered; it also instructed the jury several times that the weight to be given the evidence was for the jury to determine.
A.
Woods argues that the trial court erred when it overruled his objection to Officer Collins’s testimony about searching the City of Birmingham’s computerized files for Woods’s name. The record reflects that Woods did not object until after Officer Collins had testified that he checked Woods’s name in the City of Birmingham’s files, and after he explained that “[t]he city has files if you have been arrested.” (R. 507.) Woods then objected but stated no grounds for the objection. Therefore, this issue was not properly preserved for review, see Shouldis v. State, 953 So.2d 1275, 1284 (Ala.Crim.App.2006) (holding that to preserve an alleged error in the admission of evidence, “a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated and a ruling on the objection must be made by the trial court”), and we review it under the plain-error rule. See Rule 45A, Ala.R.App.P.
The State correctly argues that evidence of Officer Collins’s search through the City of Birmingham’s files was not offered as Rule 404(b) evidence, but rather, was offered as part of Officer Collins’s explanation of the steps he took to gain information about Woods. Officer Collins did not testify that he found any prior arrests for Woods in the search of the files, although he did testify that he located “a Nathaniel Woods” and “an address in close proximity to this location,” and with a date of birth that was close to the age he guessed Woods to be. (R. 507.) However, he did not testify that the person he located in the files was Woods in this case, nor did he testify that the person had a prior arrest. Officer Collins’s testimony cannot fairly be considered testimony regarding any prior bad act of Woods’s, and the brief reference to searching the City of Birmingham’s files did not violate Rule *20 404(b). Therefore, we find no error, plain or otherwise, as to this claim.
B.
Woods also argues that the trial court erred when it permitted Marquita McClure to testify that Woods sold drugs from the apartment, that she had seen Woods carrying a gun before the shootings, and that she had seen Woods and Spencer shooting guns the night before the shootings; when it permitted Fernando Belser to testify that Woods sold drugs from the apartment and that Woods and Spencer sometimes made as many as 150 drug sales per day, that guns were kept in the apartment, and that Woods carried a gun; and when it permitted Michael Scott to testify that he had previously purchased cocaine from Woods at the apartment.[4] Woods alleges that the foregoing testimony violated Rule 404(b) and that it was inherently prejudicial. As Woods admits in his brief, he did not object at trial to any of this testimony; therefore, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
During opening statements, both attorneys for the State and for Woods went into detail about the drug operation Woods and Spencer ran together, about drug sales from the apartment, and about the guns in that apartment, including the SKS assault rifle Spencer purchased the night before the shooting. Officer Collins, the first witness to testify at trial, testified that when he heard a call on the police radio indicating that Officer Owen had gotten out of his patrol ear at the green apartments, he was familiar with that location because it had “been a drug problem area for years.” (R. 498.) When Officer Collins arrived at the green apartments and heard Woods cursing with “venom and hatred,” he was “shocked ... because at most drug houses they don’t want contact with the police because us being there and us being in the area or having contact with them hurts their business.” (R. 498.) McClure, Bel-ser, and Scott later testified about the drug sales by Woods and Spencer from the apartment, and Belser and McClure testified about the guns in the apartment and the guns Woods and Spencer carried on their persons. As part of his defense, Woods presented testimony from Marke-sha Williams about the drug sales in the apartment and about seeing at least one gun there. In addition, Travis Dumas, another defense witness, testified that he had acted as a “doorman” at the apartment, which he characterized as a “dope house,” where his job was to watch out for the police and to assist people who were there to purchase drugs from Woods and Spencer. Dumas also testified that he saw Spencer with the assault rifle, and that, when the police arrived the day of the shootings, he thought “they were probably going to bust it because there’s probably some drugs in the house.” (R. 1508.) Woods also presented testimony from Spencer, who testified that he and Woods operated a crack house, a “24-7 operation” (R. 1541), and that they had “plenty of guns” in the apartment (R. 1536). Finally, during closing arguments, the attorneys for both the State and for Woods made numerous references to Woods being a drug dealer, to Woods and Spencer operating a crack house, and to the presence of guns in the apartment. For example, defense counsel stated, ‘Tes, he was a drug dealer. He was caught up in using drugs, and he sold drugs out of that apartment. Yes, he had a .44, which was found in the *21 house and was not fired.” (R. 1715-16.) Counsel also stated: “So he’s got a big mouth. He’s got a bad attitude. There’s lots of guns in the house. He sold drugs. He says bad things. He has drawings we don’t like.” (R. 1719.)
Clearly then, the jury heard not only in the arguments of counsel but also in the testimony of numerous witnesses that Woods and Spencer were operating a drug business in their apartment and that they had numerous guns in the apartment. However, Woods objects on appeal to the testimony of only three witnesses and argues that their testimony about guns and drugs was improper character evidence and was inherently prejudicial. Although we agree that testimony from McClure, Belser, and Scott regarding Woods’s drug sales and gun possession was prejudicial to Woods, we do not find that the testimony was inadmissible or that its admission constituted error. To the contrary, the testimony of those three witnesses and the others who testified about the drug sales and gun possession, in addition to counsel’s arguments, established that drug sales and weapons were part of the res gestae or the continuous transaction of events in this case. Furthermore, the testimony established Woods’s motive and intent, which were primary issues in the trial.
“Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term ‘res gestae ’ because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the ‘complete story’ of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute ‘other crimes, wrongs, or acts’ as is generally excluded under Rule 404(b). Other courts hold that Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule — ie., that such acts are merely offered, rather than to prove bad character and conformity therewith, to show all the circumstances surrounding the charged crime.”
C. Gamble, McElroy’s Alabama Evidence § 69.01(3) (5th ed. 1996) (footnotes omitted).
In Johnson v. State, [Ms. CR-99-1349, March 11, 2005] — So.3d-(Ala.Crim.App.2005), rev’d on other grounds, Johnson v. State, [Ms. 1041313, October 6, 2006] — So.3d- (Ala.2006), Johnson had been convicted of capital murder for her involvement in the shooting death of her former husband, who had testified as a witness for the State of Alabama in a bigamy case against Johnson. On appeal, Johnson argued that the trial court had erred when it admitted evidence of her prior conviction for bigamy, when it admitted testimony about her previous adulter *22 ous relationships, and when it admitted testimony that she had solicited her code-fendant, who was her current husband at the time of the murder, to beat up a man she had previously dated. After discussing the res gestae or “complete story” exception to the exclusionary rule, this Court upheld the admission of all of the challenged evidence.
Specifically, evidence about the bigamy conviction was admissible, this Court held, because the State had been required to prove that the victim had been a witness and that there was a causal relationship between his participation as a witness and his murder. With regard to evidence about Johnson’s previous adulterous relationships, we held that testimony about the details of those relationships were also admissible; we stated:
“Although those acts were not strictly a part of the res gestae of the murder, they tended to explain and relate to the killing; those acts were a part of one continuous transaction wherein the murder became the culmination of all of the circumstances. While somewhat peripheral, those acts were all links in the chain of events culminating in the murder.”
Johnson, — So.3d at-. We also upheld the admission of testimony that Johnson had promoted an altercation between her codefendant-husband and a man with whom she had had an adulterous affair and stated, “[T]hat evidence, although not directly linked to the instant offense, was relevant and material because it helped to explain the relationship between the co-conspirators and illustrated the nature of Johnson’s conduct as a catalyst in the murder.” Johnson, — So.3d at-. Thus, acts and circumstances, though not necessarily a part of the crime itself, are admissible when they are part of a continuous transaction and tend to explain and relate to the killing.
Here, both parties presented evidence indicating that Woods and Spencer operated a lucrative drug business, which they protected with an arsenal of weapons and “doormen” to restrict entry to the apartment, and which was disrupted by the presence of police officers on the premises. That testimony provided the jury with the context in which the shootings occurred, and it demonstrated in some detail that Woods and Spencer were equal partners in the business and that they had an equal interest in ensuring that the business was not disrupted. The evidence was necessary to the State’s case because it provided the background for the charged offenses and demonstrated that Woods and Spencer were inseparably connected to the charged offenses. Thus, the evidence was admissible as part of the res gestae. The evidence also established that Woods had the motive, intent, and opportunity to commit the murders, and it was relevant to show his state of mind when the police officers came to the door the day of the shootings. Therefore, the evidence was properly admitted into evidence, and we find no error, plain or otherwise, as to this claim.
 In addition, this Court notes that the evidence about Woods’s participation in the drug business, about Woods being armed, and about the presence of weapons in the apartment that was introduced through the testimony of McClure, Belser, and Scott, and about which Woods now complains, was, as noted above, also introduced in detail through the testimony of several other witnesses, including those called by the defense.
“Testimony that is inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred. McFarley v. State, 608 So.2d *23 430, 433 (Ala.Crim.App.1992). ‘The erroneous admission of evidence that is merely cumulative is harmless error.’ Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995).”
Tinker v. State, 932 So.2d 168, 188 (Ala.Crim.App.2005). Therefore, even if the testimony of McClure, Belser, and Scott had been erroneously admitted, and we do not hold that it was, it would have been harmless because it was cumulative to other testimony to the same effect.
C.
Woods next argues that the trial court erred when it admitted State’s Exhibit 332, a drawing removed from his jail cell titled “Nate $ Nookie” that depicts two men shooting on 18th Street with three flaming skulls coming from the gunfire of an automatic weapon, and State’s Exhibit 333, a document containing modified lyrics from a rap-style song. He argues that the exhibits “were so very prejudicial that they should have been excluded even if relevant under [Rule 401, Ala.R.Evid.], by the weighing test provided for in [Rule 403, Ala.R.Evid.].” (Woods’s brief at p. 52.)[5]
Rule 403, Ala.R.Evid., provides that “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
“ ‘The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). In addition, ‘[t]rial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion.’ Hayes v. State, 717 So.2d 30, 36 (Ala.Crim.App.1997).”
Gavin v. State, 891 So.2d 907, 963 (Ala.Crim.App.2003).
This Court has held:
“Whenever a person is on trial for a criminal offense, evidence of the defendant’s post-crime conduct that may fairly be inferred to have been influenced by the criminal act is admissible. The post-crime conduct of the defendant shows his or her state of mind which has been characterized by our courts as consciousness of guilt, and may be admitted as circumstantial evidence of guilt. Conley v. State, 354 So.2d 1172, 1179 (Ala.Cr.App.1977). When post-crime conduct is introduced as circumstantial evidence of a defendant’s guilt, there must be a link between the defendant and the evidence. See Stewart v. State, 398 So.2d 369, 375 (Ala.Cr.App.), cert. denied, 398 So.2d 376 (Ala.1981); see C. *24 Gamble, McElroy’s Alabama Evidence, § 190.03 (5th ed. 1996).”
Ballard v. State, 767 So.2d 1123, 1130 (Ala.Crim.App.1999).
1. The drawing.
Before the State offered these exhibits into evidence, the trial court held a hearing on the issue. At that hearing, the State argued that the drawing taken from the wall of Woods’s cell demonstrated a consciousness of guilt of the murders of the officers. Woods argued that he did not draw the picture, and the State stipulated that Woods did not draw it. However, the State argued: “Our contention is it’s a glorification of what occurred on June 17th. His name is on this paper, as well as an individual that if this Court allows in will testify that this is him stooped down shooting a weapon.” (R. 1291.) The court noted that “[i]t’s got ‘Nate and Nookie’ on it” (R. 1291), but Woods continued to argue that he did not draw the picture and also argued that the drawing did not constitute conduct or an admission. The court then said, “[A] drawing taped on his cell wall showing him and the co-defendant, it’s even got the address down there where the shooting occurred, both of them firing and blazing away with guns. Don’t you think that might show some consciousness of guilt?” (R. 1293.) The following then occurred:
“[Woods’s counsel]: Your Honor, I don’t know which — first of all, the evidence is very clear that Kerry Spencer is the only person shooting out there. I don’t know which of these people is supposed to be Nathaniel Woods, but there’s absolutely no evidence that Nathaniel Woods ever even had a weapon at the time the shooting occurred.
“THE COURT: That’s not the issue under complicity.
“[Woods’s counsel]: But that’s the issue in this picture and the prejudice outweighing the probative value.
“THE COURT: Well, that’s a [Rule] 403 argument. I hear you, but I overrule you.”
(R. 1294-95.)
The drawing was properly admitted as relevant evidence of Woods’s post-crime conduct. This Court has previously examined the admissibility of post-crime conduct. In B.H. v. State, 941 So.2d 345, 349 (Ala.Crim.App.2006), the State presented testimony that when B.H. was questioned about whether he had committed a particular sexual act with the child victim, his demeanor changed, and he averted his eyes. This Court stated that the testimony provided circumstantial evidence indicating that B.H. was guilty of the offense with which he had been charged.
In Ballard v. State, 767 So.2d 1123 (Ala.Crim.App.1999), Ballard was charged with theft from a boutique. Approximately one year after the theft, Ballard’s son found a fraudulent invoice from the boutique in a van Ballard sometimes drove. This Court held that the trial court correctly admitted the invoice as evidence of Ballard’s consciousness of guilt over Ballard’s objection that there was insufficient evidence connecting the invoice to her and held that the probative value of the evidence outweighed the danger of unfair prejudice.
Although a search of Alabama cases revealed no case involving post-crime drawings, a Colorado court has considered this precise issue. In People v. Masters, 33 P.3d 1191 (Colo.App.2001), aff'd, 58 P.3d 979 (Colo.2002), Masters was convicted of the murder and sexual mutilation of a woman, and the Colorado Court of Appeals upheld the admission of drawings and narratives depicting scenes of violence and sex that Masters had created after the crime. The Court stated that the evidence was *25 relevant to show Masters’ guilty knowledge and noted that one exhibit in particular “reasonably could be interpreted to correspond to events on the night of the victim’s death.” Masters, 33 P.3d at 1199. The Court also determined that the probative value of the narratives and drawings outweighed the risk of undue prejudice. We find the Colorado Court’s reasoning to be relevant here.
The drawing taken from Woods’s cell can be interpreted as depicting the shooting of the three police officers on 18th Street. The drawing depicts Woods as an active participant in that crime, and although Woods did not draw the picture, his nickname was prominently written at the top of the page, along with Spencer’s nickname, and the drawing was important enough to Woods that he hung it on the wall of his cell. Moreover, when a deputy removed the drawing, Woods told the deputy that the picture was his and that he wanted it back. As the State argued at trial, the drawing glorified the shooting and Woods’s involvement in it. The post-crime drawing was relevant to Woods’s intent and it indicated a consciousness of guilt. Because Woods’s defense was that he was not involved in the shooting and that he was an innocent bystander, the fact that he displayed a drawing depicting his partnership in the shooting with Spencer held substantial probative value.
Evidence offered against a defendant at trial is usually prejudicial. However, the probative value of evidence is substantially outweighed by its prejudice only when it is unduly and unfairly prejudicial. See e.g., Hurley v. State, 971 So.2d 78, 81-82 (Ala.Crim.App.2006), and the cases quoted therein; and Irvin v. State, 940 So.2d 331, 346 (Ala.Crim.App.2005), and the cases quoted therein. Here, we do not find the evidence to be unduly and unfairly prejudicial, and we find no error in the trial court’s determination that the probative value of this evidence was not substantially outweighed by undue prejudice. Finally, we note that the trial court gave a limiting instruction to the jury when the drawing was admitted and again during its final charge.
Therefore, we find no error, plain or otherwise, as to this claim.
2. The lyrics.
Woods also argues that the trial court erred in admitting State’s Exhibit 333, the lyrics adapted from a rap-style song that include the phrases, “I have no remorse because I’m the fuckin murderer,” and “I drop pigs like Kerry Spencer.” (C. 2087.) During the hearing on the State’s proffer of evidence pursuant to Rule 404(b), the trial court overruled Woods’s objections to State’s Exhibit 333; however, it does not appear that the State ever introduced that exhibit into evidence before the jury. Rather, the State introduced Exhibit 337-A, which appears to be the original document and which contains the same language as that in Exhibit 333, which appears to be a photocopy of State’s Exhibit 337-A. However, the expert handwriting analyst determined that the original document had been written by Woods. Therefore, out of an abundance of caution, we will address this claim of error and evaluate the trial court’s admission of State’s Exhibit 337-A.
At the hearing on the admissibility of this evidence, defense counsel argued that Woods had modified the lyrics of a rap-style song, and that it constituted improper character evidence. The trial court quoted from the lyrics and stated: “That’s almost an admission.” (R. 1298.) Finding that the lyrics could be construed as an indication of Woods’s consciousness of guilt, the trial court ruled that the evidence was admissible and stated that it would instruct the jury that the evidence *26 was offered for a limited purpose. (R. 1300.)
During the trial, Det. Russell testified that he obtained State’s Exhibit 337-A and he read into the record the words from the lyrics, which included the phrases, “I’m a fucking murderer,” and “I drop pigs like Kerry Spencer.” (R. 1359.) The trial court gave a limiting instruction to the jury when the exhibit was admitted and again during its final jury charge.
As discussed above with regard to the drawing, the question before us is whether, as Woods contends, the probative value of the lyrics was substantially outweighed by the danger of undue prejudice and, thus, in admitting it the trial court abused its discretion. We find no abuse of discretion.
Woods argued at trial that he did not know that Spencer was going to shoot the officers and that he was not involved in the shooting. Evidence that Woods copied and retained possession of lyrics to a rap-style song that he had modified to indicate that he was a killer and that he had watched “pigs” collapse and that he had no remorse contradicted his claim and was highly relevant to his intent and as an indication of his consciousness of guilt. As with the drawing, we acknowledge that admission of the lyrics was prejudicial to Woods’s case; however, based on our analysis in the previous section of this opinion regarding post-crime actions, we conclude that nothing in the record warrants a finding that the lyrics Woods modified and copied after the shooting were unduly or unfairly prejudicial or that the probative value was substantially outweighed by any undue prejudice. The lyrics were properly admitted as post-crime evidence of Woods’s consciousness of guilt of the crimes charged.
Therefore, we find no error, plain or otherwise, as to this claim.
II.
Woods contends that the evidence was insufficient to sustain his conviction as an accomplice pursuant to § 13A-2-23, Ala.Code 1975. Specifically, he argues that there was no evidence indicating that he possessed or fired a gun during the shooting and that there was no physical or forensic evidence linking him to the crime. Woods made motions for a judgment of acquittal at the close of the State’s case and again at the close of all the evidence.
This Court has often stated the standard for challenges to the sufficiency of the evidence. In Oliver v. City of Opelika, 950 So.2d 1229 (Ala.Crim.App.2006), we stated:
“ ‘ “In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” ’ Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ‘“The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’ Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘ “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.” ’ Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d *27 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978)."
950 So.2d at 1230.
Section 13A-5-40(c), Ala.Code 1975, allows for a capital-murder conviction based on principles of accomplice liability. The statute states:
“A defendant who does not personally commit the act of killing which constitutes the murder is not guilty of a capital offense defined in subsection (a) of this section unless that defendant is legally accountable for the murder because of complicity in the murder itself under the provisions of Section 13A-2-23, in addition to being guilty of the other elements of the capital offense as defined in subsection (a) of this section.”
Section 13A-2-23, Ala.Code 1975, Alabama’s complicity statute, provides:
“A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
“(1) He procures, induces or causes such other person to commit the offense; or
“(2) He aids or abets such other person in committing the offense; or
“(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make.”
The Commentary following § 13A-2-23 states that “[e]ach person who joined [the] unlawful enterprise is responsible for the results whether committed by one or all, Carlisle v. State, 36 Ala.App. 241, 58 So.2d 638 [ (1951) ], cert. denied, 257 Ala. 282, 58 So.2d 641 (1952).”
“ ‘ “Aid and abet ‘comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.’ ” Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911), quoted in Radke v. State, 292 Ala. 290, 292, 293 So.2d 314 (1974). If the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established. Jones, supra; Raiford v. State, 59 Ala. 106, 108 (1877). “The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Fuller v. State, 43 Ala.App. 632, 198 So.2d 625 [ (1966) ]. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence.” Miller v. State, 405 So.2d 41, 46 (Ala.Cr.App.1981); Watkins v. State, 357 So.2d 156, 159 (Ala.Cr.App.1977), cert. denied, 357 So.2d 161 (Ala.1978).’
“Quoted with approval in Travis v. State, 776 So.2d 819, 862-3 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001).”
Pilley v. State, 930 So.2d 550, 565 (Ala.Crim.App.2005), quoting Gwin v. State, 456 So.2d 845, 851 (Ala.Crim.App.1984).
In Buford v. State, 891 So.2d 423 (Ala.Crim.App.2004), we further explained:
“ ‘ “Such facts as the defendant’s presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which par *28 ticipation may be inferred.” Sanders v. State, 423 So.2d 348, 351 (Ala.Crim.App.1982). However,
“ ‘ “ ‘[t]he mere fact that a person witnesses a crime does not make him an accomplice.’ Nelson v. State, 405 So.2d 392, 397 (Ala.Cr.App.1980), reversed on other grounds, 405 So.2d 401 (Ala.1981). ‘The mere presence of a person at the time and place of a crime is not sufficient to justify his conviction for the commission of the crime.’ Dolvin v. State, 391 So.2d 129, 133 (Ala.Cr.App.1979), reversed, 391 So.2d 133 (Ala.1980). However, ‘if presence at the time and place a crime is committed, in conjunction with other facts and circumstances, tends to connect the accused with the commission of the crime, then the [trier of fact] may find the accused guilty.’ Dolvin, 391 So.2d at 137. ‘[Presence, companionship, and conduct before and after the offense are circumstances from which one’s- participation in the criminal intent may be inferred.’ 22 C.J.S. Criminal Law § 88(2)(d) (1961). Gibson v. State, 49 Ala.App. 18, 20, 268 So.2d 49 (1972).
[[Image here]]
“ ‘ “Although mere presence at the time and place of a crime is not sufficient to justify a conviction for the commission of that crime, presence is a factor to be considered by the [trier of fact] in determining the guilt of the accused because ‘mere presence does establish a “material fact, which is the opportunity of defendant to commit the offense.” ’ German [v. State], 429 So.2d [1138,] 1141 [(Ala.Crim.App.1982) ].
“ ‘ “To make one accused of a crime an accomplice, ‘the State must adduce some legal evidence implying that he either recruited, helped or counseled in preparing the [crime] or took or undertook some part in its commission. Criminal agency in another’s offense is not shown merely by an exhibition of passivity.’ Pugh v. State, 42 Ala.App. 499, 502, 169 So.2d 27 (1964).”
“ ‘Payne v. State, 487 So.2d 256, 261-62 (Ala.Crim.App.1986). See also Webb v. State, 696 So.2d 295 (Ala.Crim.App.1996).’
“Harris v. State, 854 So.2d 145, 151-52 (Ala.Crim.App.2002)....
“Also, ‘ “[i]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.” ’ Seaton v. State, 645 So.2d 341, 343 (Ala.Crim.App.1994), quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986). Intent “ ‘ “may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.’ ” ’ Farrior v. State, 728 So.2d 691, 695 (Ala.Crim.App.1998), quoting Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991) quoting in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.1980).
‘ “The intent of a defendant at the time of the offense is a jury question.” ’ C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App.2001), aff'd, 841 So.2d 292 (Ala.2002), quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993).”
891 So.2d at 428-29.
Reviewing the evidence in the light most favorable to the State and according the State all reasonable inferences from the evidence, we find that the State presented sufficient evidence to submit the case to the jury and that the trial court did not err when it denied the motions for a judgment of acquittal. The State established that *29 Woods and Spencer had engaged in a hostile, profanity-laced argument with Officers Owen and Collins on the morning of the shootings, and that Woods threatened Officer Owen by stating: “Take off that badge and I will fuck you up.” (R. 501.) Officer Sanders testified that Officer Chi-solm had told him that Woods had taunted the police by saying, “You can’t get me,” and then running into the apartment. (R. 639.) Marquita McClure and Markesha Williams testified that, after the police left, Woods stated that he would kill the police. Fernando Belser testified that Spencer said that if the police did not stop harassing him, he would “light 'em up,” and that Woods had said “[bjasically the same thing” Spencer had said. (R. 762.) McClure asked Woods to leave the apartment with her, but Woods told her that he wanted to stay with Spencer in case the police came back.
Officer Collins testified that when the officers returned to the apartment to arrest Woods, a man who had been outside said that he wanted no part of what was to take place. When the officers told Woods that they had a warrant for his arrest and attempted to take him into custody, Woods cursed them and refused to come outside. He told the officers, “ ‘If you come in here, we’ll fuck you up.’ ” (R. 694.) He then turned and ran toward the back of the apartment, causing the officers to pursue him to the doorway between the kitchen and the living room. Belser had previously testified that no one went beyond the kitchen area of the apartment unless Woods or Spencer invited them, and he said that anyone who did so could “get hurt pretty bad” or “something could happen to them.” (R. 754.) Spencer appeared with the assault rifle, and he fired it repeatedly, shooting Officers Owen and Chisolm multiple times. Woods told Spencer that another officer was at the front door, and Spencer turned and also shot Officer Bennett multiple times.
Spencer and Woods ran from the apartment together; they ran to John Prather’s house because Woods knew Prather. After they burst into Prather’s house, Spencer and Woods let Prather know that he would be compensated for letting them stay there, and Prather deduced that the pair had been involved in the shooting nearby. Woods told Spencer, “You came through for me,” Prather said. (R. 842.) Michael Scott was inside Prather’s house when Woods and Spencer entered, and he heard Woods say something like, “ ‘They fucked with the wrong niggers. We shot their asses.’” (R. 860.) Scott described Woods’s demeanor as calm, not upset, when he made this statement.
After Woods was arrested, Officer Owen’s weapon was recovered from Prather’s house, behind a heater near where Woods had been sitting. Although Spencer testified at his trial that he took Officer Owen’s gun before he left the apartment, in his statement to the police on the afternoon of the shooting, Spencer denied taking the weapon, thus permitting an inference that Woods walked into the kitchen after the shooting and took the officer’s weapon before he and Spencer left the apartment.
While Woods was in jail, a deputy found hanging on the wall of his cell a drawing with the heading “Nate $ Nookie.” The drawing depicted two men shooting firearms near a street sign indicating the intersection of “18th Street and Ensley”; the drawing depicted three flaming skulls in the gun blast from the automatic weapon one of the men is shooting. The apartment where the officers were killed was on 18th Street in Ensley. When the deputy took the drawing, Woods protested, stating that the drawing was his and that he wanted it back. In addition, modified rap-style *30 song lyrics were taken from Woods’s cell; the document included the statements, “I’m a fuckin murderer” and “I drop pigs like Kerry Spencer.” (State’s Exhibit 337-A.) Steve Drexler, a document examiner, testified that based on his comparison of that document with a known sample of Woods’s handwriting, he had determined that Woods was the person who wrote the words on the document seized from his cell.
Finally, the State presented testimony about Woods’s other hostile actions toward law-enforcement personnel. A former officer of the Fairfield Police Department, Greg Parker, testified that in December 2003 Woods had acted in a menacing way toward him and had told Officer Parker that he could have shot him; Woods was found to be in possession of a pellet gun when he made the statement. While he was in jail awaiting trial on these charges, Woods told Deputy William Powell that the deputy was hiding behind his badge “just like the other three mother fuckers,” and that if he won his case, he was going to come looking for Deputy Powell. (R. 1318.)
When defense counsel made the motion for a judgment of acquittal after the State presented its case, counsel argued that the State had not presented sufficient evidence to convict Woods under a complicity theory and that the evidence was insufficient to warrant submission of the case to the jury. The trial court replied:
“Let me ask you this. What about the statements that have been testified to by the people inside the apartment after the officers left at 10:30 or 11 o’clock and before they came back a little after 1? What if the jury believed your client said what those witnesses said he said? And what if they believe what Mr. Prather and Mr. Scott said? And what if they believe what’s written in some of the documents your client wrote up in the jail cell? Doesn’t that make it a jury issue as to whether he’s a co-conspirator ... in this case?”
(R. 1425-26.) We agree with the trial court.
The evidence presented at trial, as summarized previously in this opinion and as more succinctly summarized above by the trial court, was sufficient to establish a prima facie case for each count of capital murder and provided sufficient evidence of Woods’s complicity in the murders of the police officers. “Such facts as the defendant’s presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred.” Sanders v. State, 423 So.2d 348, 351 (Ala.Crim.App.1982), citing Smith v. State, 57 Ala.App. 151, 326 So.2d 680 (1975). The State presented evidence about Woods’s actions before, during, and after the crime from which the jury could have determined that Woods was an active participant in the murders.
Moreover, to the extent that Woods argues that the State did not prove that he ever touched the murder weapon and that the State did not present any physical or forensic evidence that linked him to the shootings, we note that the State is not required to present evidence that Woods touched the gun, or that the police found blood spatter, gunshot residue on his hands, or any other physical or forensic evidence. The law of complicity, as set out at the beginning of our discussion of this issue and as explained in the judge’s charge to the jury, did not require proof of physical evidence to establish Woods’s guilt. Rather, as the judge correctly charged the jury: “[W]hen two or more people enter upon an unlawful purpose with a common intent to aid and encourage each other in anything within that common *31 design or plan, each is legally criminally responsible for everything that may reasonably flow from that common criminal enterprise.” (R. 1759.)
The State presented sufficient evidence, including Woods’s actions before, during, and after the crime, from which the jury could have found that Woods had planned the shootings with Spencer and that he was present during the shootings and encouraged and assisted Spencer in the commission of the crimes. Because the State presented legally sufficient evidence, the trial court correctly denied Woods’s motions for a judgment of acquittal and presented the case to the jury for its resolution.
III.
Woods contends that the trial court committed reversible error in several eviden-tiary rulings during the penalty phase of the trial. Specifically, he argues that the trial court erred when it sustained the State’s objections to the testimony of Cynthia Sherman, Woods’s aunt, and when it precluded his cousin, Shena Carter, from testifying about the impact Woods’s execution would have on her. He also argues that the trial court erred when it overruled his objections to victim-impact testimony from the officers’ widows.
A.
The principles relevant to the admission of proposed mitigating evidence in a capital-murder trial are well established.
“The United States Supreme Court had declared that a defendant convicted of capital murder must be allowed to present at the sentencing hearing a broad range of proposed mitigating evidence. The Court held:
“ ‘[WJe conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.’
“Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)(footnotes omitted).
“By statute, Alabama law allows a broad spectrum of evidence to be offered as mitigation:
“ ‘In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.’
“ § 13A-5-52, Ala.Code 1975.
“Our Supreme Court has previously stated:
“ ‘To determine the appropriate sentence, the sentencer must engage in a “broad inquiry into all relevant mitigating evidence to allow an individualized determination.” Buchanan v. Angelone, 522 U.S. 269, 276 (1998). Alabama’s sentencing scheme broadly allows the accused to present evidence in mitigation. Jacobs v. State, 361 So.2d 640, 652-53 (Ala.1978). See 13A-5-45(g), Ala.Code 1975 (“The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52.”). “[Ejvidence about the defendant’s background and character is relevant *32 because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.” California v. Brown, 479 U.S. 538 (1987) (O’Connor, J., concurring specially).’
“Ex parte Smith, [Ms. 1010267, March 14, 2003] — So.3d [-, - (Ala.2003) ].
“Evidence proffered in mitigation by the defendant must be relevant, however, and the determination of relevance is a decision for the trial court to make in the sound exercise of its discretion. Knotts v. State, 686 So.2d 431, 444 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996). We stated in Knotts:
“ ‘The determination of the relevancy of evidence lies within the sound discretion of the trial court. Borden v. State, 522 So.2d 333 (Ala.Cr.App.1988); C. Gamble, McElroy’s Alabama Evidence, § 21.01(6) (4th ed.1991). Here, the trial court was required to admit all relevant mitigating evidence of the appellant’s character or record and any circumstances pertaining to the offenses. The question before us is whether the trial court abused its discretion in refusing to admit evidence pertaining to members of the appellant’s family.’ ”
Beckworth v. State, 946 So.2d 490, 504-05 (Ala.Crim.App.2005).
During the testimony of Woods’s aunt, Cynthia Sherman, defense counsel asked the following question:
“Now, I want you, if you could, just take your time though, but I want you to tell the ladies and gentlemen of the jury anything that’s on your heart about how you feel now, okay? If you have anything to tell them before they make up their minds today or tomorrow, whenever they do, about the sentencing? Do you have anything you would like to say?
(R. 1802.) The State did not object to this open-ended question, and Sherman began to answer it as follows:
“Well, first of all, I would like to say that through all of this — and I know my heart goes out to the family. And I know it just don’t seem right for me saying that, but I’m sorry. I would like the jury to know that I got a phone call last night from my nephew, and he told me to be strong and — ”
(R. 1803.) The State then objected and the trial court sustained the objection. Woods did not, following the State’s objection, make an offer of proof to show what Sherman would have testified to if she had been permitted to complete her answer. Rather, defense counsel then asked Sherman to “tell the jury what you would like them to do” and “why,” and Sherman testified at length that she would like the jury to recommend a life-imprisonment-without-parole sentence so that Woods would have the opportunity to see his children, to communicate with his family, to be an asset to others in prison, and “to find out what God has for him to do _” (R. 1804.)
“ ‘The general rule is that if a trial court excludes evidence offered by a defendant, it is the defendant’s responsibility to make an offer of proof to preserve for appellate review any error in the trial court’s refusal to accept the evidence. However, if the substance of the evidence sought to be admitted is apparent from the context within which the questions were asked, no offer of proof is necessary.’
“Myers v. State, 601 So.2d 1150, 1152 (Ala.Crim.App.1992).”
*33 Hart v. State, 852 So.2d 839, 844 (Ala.Crim.App.2002). See also C. Gamble, McElroy’s Alabama Evidence § 425.01(4) (5th ed. 1996) (“If the trial court sustains an objection made to a question which does not on its face show what is the expected answer, it then becomes the duty of the questioning party, in order to predicate review upon this as an erroneous ruling, to make an offer of proof.”).
It is unclear from the context of the record what Sherman might have testified was “on her heart,” and Woods’s counsel at oral argument conceded that it was unclear what Sherman’s answer would have been. An offer of proof was necessary to preserve this argument for review; therefore, we review the claim under the plain-error rule. See Rule 45A, Ala. R.App.P.
The trial court did not abuse its discretion when it sustained the objection. Defense counsel’s invitation to Sherman that she say anything on her heart about how she felt was not designed to, nor did it, elicit relevant mitigating evidence of Woods’s character or record or any circumstances of the offense. Sherman’s discussion of a telephone call with Woods was not relevant mitigating evidence. Although a defendant’s right to present proposed mitigating evidence is quite broad, evidence that is irrelevant and unrelated to a defendant’s character or record or to the circumstances of the crime is properly excluded. See Beckworth v. State, 946 So.2d at 507 (evidence that Beckworth’s father was currently charged with sexually abusing Beckworth’s daughter was properly excluded because it was irrelevant). Because Sherman’s testimony was not relevant as mitigation, the trial court properly exercised its discretion when it sustained the State’s objection to her testimony. Therefore, we find no error, plain or otherwise, as to this claim.
During the testimony of Woods’s cousin, Shena Carter, defense counsel asked, “Can you tell me what kind of effect if the jury were to give Nathaniel the death penalty and he were to be executed, what sort of effect that would have on you?” (R. 1809.) The trial court sustained the State’s objection. Defense counsel told the trial court that she was offering the testimony as evidence of “execution impact.” (R. 1809.) However, as with the testimony of Sherman, discussed above, Woods did not make an offer of proof to show the substance of Carter’s testimony and to preserve this alleged error for review. Therefore, we review this argument under the plain-error rule. See Rule 45A, Ala.R.App.P.
As noted above, a defendant is permitted to present a wide range of proposed mitigation, but that range is not unlimited. The proffered evidence must be relevant and it must be related to the defendant’s character or record or the circumstances of the offense. Carter’s testimony about the effect of Woods’s execution on her does not relate to any of those relevant topics. Although Alabama appellate courts have apparently not addressed this precise issue, Texas courts have done so. In Roberts v. State, 220 S.W.3d 521 (Tex.Crim.App.2007), defense counsel requested permission to ask Roberts’s niece how she would be affected if Roberts received the death penalty. The prosecutor objected on the ground that the testimony would not be relevant, and the trial court sustained the objection. On appeal, the Texas Court of Criminal Appeals held that the issue had not been preserved because Roberts failed to make an offer of proof, and then stated: “Moreover, we have previously decided that a trial court does not abuse its discretion in excluding ‘execution-impact’ testimony.” Roberts, 220 S.W.3d at 532, citing Jackson v. State, 33 S.W.3d 828, 834 (Tex.Crim.App.2000). Other state *34 courts have also held that execution-impact testimony is irrelevant because it does not relate to a defendant’s character or record or the circumstances of the crime. See Commonwealth v. Harris, 572 Pa. 489, 524-25, 817 A.2d 1038, 1054 (2002) (citing cases upholding exclusion of third-party or execution-impact testimony).
Because the testimony concerning the impact Woods’s execution would have on Carter was not relevant, we hold that the trial court did not abuse its discretion when it precluded that portion of Carter’s testimony. Therefore, we find no error, plain or otherwise, as to this claim.
B.
Woods also makes the following argument on appeal:
“Paradoxically, the Court allows over defense objections very similar testimony from Bobbie Owen (T. 1840); and even allows the widow to introduce photographs of the victim[’]s grandchildren into evidence (T. 1841) (C. 2095-2099), after refusing to allow defense witnesses] to talk about the very same issues. Susan Bennet [sic] is allowed to testify as to similar material (T. 1847) and introduce photographs of her child (T. 1846) (C. 2094). Stacy Sellers, [the widow of officer Chisholm], is even allowed to talk about painting a bedroom in anticipation of trying to have a child (T. 1849). In all these instances, defense counsel ... promptly objected, stating the basis of each objection for the record.
“The admission of testimony by the victim’s widows about the victim’s relationships with the children and grandchildren, on rebuttal, in the [penalty] phase constituted error and was inherently unfair from the same judge who sustained State’s objections to similar evidence when offered by defense witnesses.”
(Woods’s brief at pp. 58-59.)
Bobbie Owen testified that she and Officer Owen had five children. Defense counsel objected that the testimony was not related to a statutory aggravating circumstance. Ms. Owen testified without objection that they had nine grandchildren, and she named several of them. When the State offered into evidence photographs of some of the grandchildren, defense counsel stated, “Same objection under Rule 401 and 403, Alabama Rules of Evidence, Judge.” (R. 1841.) The trial court overruled the objection and admitted the photographs into evidence. As for Woods’s assertion that Susan Bennett testified “as to similar material (T. 1847) and intro-duee[d] photographs of her child (T. 1846),” the record reflects that Ms. Bennett testified without objection that she and Officer Bennett had one child who was six years old at the time of the trial. When the State offered into evidence a photograph of the child, defense counsel objected “under 401, 401(b) and 403[, Ala. R.Evid.,] as improper testimony. In addition to that, we would like to add to the record our objection that this is in fact not rebuttal of anything that was said by witnesses in ... the defense case.” (R. 1846.) The trial court overruled the objection and admitted the photograph into evidence. (R. 1847.) Stacey Sellers, Officer Chi-solm’s widow, testified without objection that she and Officer Chisolm had no children, but that they planned to have children. When the prosecutor asked Ms. Sellers if they had done anything in preparation for having children, defense counsel objected on the ground that the testimony was not relevant, was not rebuttal testimony, and was not about an aggravating circumstance. (R. 1848.) The trial court overruled the objection, but the prosecutor asked another question. Ms. Sellers later *35 testified without objection that she and Officer Chisolm had recently painted a bedroom “in hopes of having a child and that’s never going to happen.” (R. 1849.)
Woods argues that the admission of the foregoing testimony was “inherently unfair” because, he says, the court had sustained the State’s objections to similar testimony offered by defense witnesses. We note, first, that Woods did not enter timely objections to much of the testimony he now argues was improperly admitted. Thus, we review the arguments as to that testimony under the plain-error rule.
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held:
“[A] State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. ‘[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.’ Booth [v. Maryland ], 482 U.S. [496, 517 (1987)] (White, J., dissenting) (citation omitted). By turning the victim into a ‘faceless stranger at the penalty phase of a capital trial,’ [South Carolina v.] Gathers, 490 U.S. [805, 821 (1989)] (O’Connor, J., dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.”
501 U.S. at 825, 111 S.Ct. 2597. The Supreme Court further stated:
“We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.”
Payne, 501 U.S. at 827, 111 S.Ct. 2597. The Supreme Court recognized that victim-impact evidence “is designed to show instead each victim’s ‘uniqueness as an individual human being,’ whatever the jury might think the loss to the community resulting from his death might be.” Payne, 501 U.S. at 823, 111 S.Ct. 2597.
Here, the testimony provided by the officers’ widows was offered to show that each officer’s death caused a unique loss to his family and to show the impact the murders had on the family members. Part of that testimony, the portion about which Woods apparently is complaining here, was elicited to show that Officer Owen was married and had children and grandchildren, that Officer Bennett was married and had a child, and that Officer Chisolm was married and had planned to start a family. This testimony was offered in rebuttal to the evidence Woods offered as mitigation — that he was a father of three children whom he loved very much. This was legitimate victim-impact evidence, which we have previously held to be admissible during the penalty phase of a capital-murder trial. See, e.g., Belisle v. State, 11 So.3d 256, 317 (Ala.Crim.App.2007). The trial court did not abuse its discretion when it permitted the witnesses *36 to testify about the victims and their families.[6]
To the extent Woods argues that he was precluded from presenting testimony similar to that presented by the officers’ widows, the record discloses otherwise. Cynthia Sherman, Woods’s aunt, testified about their relationship and stated that if Woods received a sentence of life imprisonment without parole, he could communicate with his family and see his children. Woods’s cousin, Shena Carter, testified that Woods has three children, that Woods appeared to love his children and that they loved him, and that Woods was loving toward his friends and his family. Woods’s mother, Pamela Woods, testified about their family and Woods’s upbringing, and also stated that Woods has three children. In addition, Woods testified before the jury that he has three children, and he gave their names and ages; a photograph of his children was admitted into evidence.
Therefore, the trial court committed no error, plain or otherwise, when it permitted the foregoing testimony during the State’s rebuttal case.
IV.
Woods contends that he was denied the effective assistance of counsel
during the penalty phase of his trial because, he says, his attorneys did not meet the minimum standards for representation of a defendant facing the death penalty set forth in the American Bar Association (“ABA”) guidelines. Specifically, he appears to argue that counsel’s performance did not meet the guidelines because counsel did not consult with a mitigation expert and because counsel did not present evidence of additional mitigating factors, such as his mental state and that he was acting under extreme duress or the domination of another person. These arguments were not raised below, so we review them under the plain-error rule. See Rule 45A, Ala. R.App.P.
The principles governing our review of this argument were set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in which the United States Supreme Court held:
“A convicted defendant’s claim that counsel’s assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not *37 functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
466 U.S. at 687, 104 S.Ct. 2052.
The record before us contains no support for Woods’s allegations. Before trial the prosecutor stated that he was not familiar with Rita Briles, one of Woods’s attorneys, and he wanted to be sure that they were “not running into some issue here where she doesn’t statutorily qualify to be appointed in a capital case.” (R. 78.)[7] Briles informed the court that she had 12 years’ experience and the court stated that she appeared to be qualified. Cocounsel Cynthia Umstead then stated: “In addition to that, Judge, both Ms. Briles and I meet the ABA standards for appointed counsel as recently passed or adopted by the Circuit Court Judges Association of having the 12 hours of capital litigation training every other year.” (R. 78.) However, the record before us contains no evidence about the scope of counsel’s mitigation investigation, about which Woods now appears to complain. The record does reflect that during a pretrial hearing held on December 3, 2004, the trial court granted a defense motion for funds for a private investigator and informed Woods that if he required additional funds he could file a motion to establish the need for the funds. The court then considered a defense motion to retain a psychologist. Woods argued that he needed the evaluation for “mitigating purposes,” and the trial court stated: “If you want a mitigation expert, which I assume that’s what it sounds like you are asking for, I will give you twenty-five hundred dollars for that and you can use whoever you want to.” (R. 44.) Thus, Woods’s assertion that trial counsel “conducted an inadequate investigation into possible mitigating evidence” (Woods’s brief at p. 70) is unsupported by the record and, in fact, the record provides an inference that counsel intended to hire a mental-health expert as part of their mitigation investigation. Furthermore, this Court has quoted with approval the following from Grayson v. Thompson, 257 F.3d 1194 (11th Cir.2001):
“ ‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, “where the record is incomplete or unclear about [counselj’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’ Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc) (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)).”
257 F.3d at 1218. See, e.g., Brooks v. State, 929 So.2d 491, 497 (Ala.Crim.App.2005); Robitaille v. State, 971 So.2d 43, 73 (Ala.Crim.App.2005) (both cases quoting Grayson). Based on the record before us, we conclude that Woods has failed to establish that counsel’s performance was deficient.
As to the prejudice prong, Woods argues that “there is a reasonable probability that had counsel conducted a reasonable inves *38 tigation into possible mitigating evidence, the balance between the aggravating eir-cumstanee[s] and the mitigating circumstances would have tipped further in favor of a sentence of life imprisonment without the possibility of parole.” (Woods’s brief at p. 69.) However, other than a brief assertion that counsel failed to “put on evidence of [Woods’s] mental state” (Woods’s brief at p. 69), Woods has not identified any specific mitigating evidence that existed that he believes counsel failed to discover and present. Significantly, we have nothing in the record before us regarding Woods’s mental state, and the record is equally silent as to any additional mitigating factors that allegedly existed but were not discovered or presented by defense counsel. Furthermore, nothing in the record before us indicates that, if some as-yet-unidentified evidence had been offered as mitigation, the jury would have recommended a sentence of life imprisonment without parole and that the trial court would have imposed a sentence of life imprisonment without parole.
This Court will not find plain error with regard to trial counsel’s performance based on an argument supported by only speculation from a silent record.
Y.
Finally, Woods argues that the jury-verdict-override sentencing scheme of Alabama’s capital-murder statute is unconstitutional, and he sets forth several specific reasons in support of his argument. Woods, however, does not have standing to raise any argument about the constitutionality of Alabama’s statute regarding jury-verdict override.
The jury in this case recommended by a vote of 10 to 2 that the trial court impose a death sentence on Woods. When the trial court sentenced Woods to death, it did not override a jury recommendation of life imprisonment without parole. Therefore, none of Woods’s arguments concerning the alleged unconstitutionality of the override provisions of Alabama’s death-penalty statute have any application to Woods’s case, and he has no standing to challenge them in this proceeding.[8] As this Court noted in Beckworth v. State, 946 So.2d 490 (Ala. Crim.App.2005), in analyzing an analogous issue:
“As to his claim that Alabama’s death-penalty statute is unconstitutional because it permits the execution of mentally retarded defendants and because it contains no standards for determining whether a defendant is mentally retarded, we find that these allegations of error need not be addressed because we have already held that the trial court correctly determined that Beckworth is not mentally retarded. J.L.N. v. State, 894 So.2d 751 (Ala.2004); Gavin v. State, 891 So.2d 907, 935-38 (Ala.Crim.App.2003) (both cases holding that a defendant cannot challenge the constitutionality of a statute when he cannot show that the statute’s alleged unconstitutional feature adversely affected him).”
Beckworth, 946 So.2d at 511.
Because Woods did not receive a recommendation of life imprisonment without pa *39 role from the jury in his case, Woods does not have standing to raise arguments about the constitutional validity of the override provisions of the statute. He is therefore not entitled to review of, or relief on, these allegations of error.
VI.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Woods’s capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
However, our review of the record reveals that, in its sentencing order, the trial court did not “enter specific written findings concerning the existence or nonexistence of ... any additional mitigating circumstances offered pursuant to Section 18A-5-52,” as required by § 13A-5-47(d), Ala.Code 1975. (Emphasis added.) Although the trial court thoroughly addressed and made specific fact findings regarding the statutory aggravating circumstances and statutory mitigating circumstances, it did not make specific findings regarding the existence or nonexistence of nonstatutory mitigating circumstances offered pursuant to § 13A-5-52. The trial court stated in its order that it had considered all the matters presented, including “the testimony heard at trial and at the sentencing hearing before this Court, both in mitigation and aggravation, considering the nonstatutory evidence of mitigation of the defendant’s background, the pre-sentence investigation report and the recommendation of the jury contained in its advisory verdict of death .... ” (C. 108; emphasis added.) Thus, although it is clear from the order that the trial court considered the evidence Woods offered as nonstatutory mitigation, it is not clear whether the trial court found any of the evidence to constitute nonstatutory mitigation.
In Morrow v. State, 928 So.2d 315 (Ala.Crim.App.2004), this Court addressed a similar situation:
“In addition, in its order, the trial court stated the following regarding nonstatutory mitigating circumstances:
“‘The Judge, just as the jury, is entitled to consider anything, any matter that the Court might find in any way to be mitigating in order to consider the same and balance the same with the aggravating circumstances as found by the Court. There was evidence and testimony presented during the trial and sentencing phases of the Defendant’s home life, early family life, lack of education and lack of a functional and traditional family unit. The Court has carefully considered all of the evidence presented during all stages of the trial in this cause, as well as the Court’s observation and evidence admitted during all proceedings, pretrial and posttrial with regard to this case and the Court finds that mitigating circumstances exist with regard to this case.’
“(C. 17.) The trial court indicated that it found nonstatutory mitigating circumstances to exist, but it failed to identify which nonstatutory mitigating circumstances it found to exist. As this Court stated in Roberts v. State, 735 So.2d 1244 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.1999):
“ ‘In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances and the mitigating circumstances as found by the trial court.’
“735 So.2d at 1269 (emphasis added). See also Guthrie v. State, 689 So.2d 935
*40 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.1997). Although ‘the trial court is not required to specify in its sentencing order each item of proposed nonstatuto-ry mitigating evidence offered that it considered and found not to be mitigating,’ Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), in order for this Court to conduct its review of the death sentence, the trial court must specifically identify in its sentencing order those nonstatutory mitigating circumstances that it did find to exist.”
928 So.2d at 326-27. More recently, in Scott v. State, 937 So.2d 1065 (Ala.Crim.App.2005), this Court remanded the case for clarification of the sentencing order, noting in part:
“In a listing of mitigating circumstances the court found not to exist, the court included, ‘Any other mitigating circumstance offered pursuant to § 13A-5-52, Code of Alabama 1975.’ (C. 77.) In the next paragraph of the sentencing order, however, the court stated, ‘The Court considered the evidence presented by the defendant as evidence of non-statutory mitigating factors.’ (C. 77.) Although the trial court need not list and make findings as to each item of alleged nonstatutory mitigating evidence offered by a defendant, Reeves v. State, 807 So.2d 18, 48 (Ala.Crim.App.2000), it must make a clear finding regarding the existence or nonexistence of nonstatuto-ry mitigating evidence offered by a defendant. § 13A-5-47(d), Ala.Code 1975. The sentencing order is unclear as to whether the court found any nonstatuto-ry mitigating circumstances to exist. On remand, this ambiguity must be clarified.”
937 So.2d at 1087-88.
As in Morrow and Scott, because the ■trial court here did not enter specific findings as to the existence or nonexistence of nonstatutory mitigating circumstances, we must remand this case to the trial court for it to amend its sentencing order to clarify its findings regarding the nonstatu-tory mitigating circumstances. If it finds it necessary, the trial court may reweigh the aggravating and mitigating circumstances and resentence Woods. The trial court’s amended sentencing order shall be submitted to this Court within 42 days of the date of this opinion. We pretermit our plain-error review of Woods’s death sentence pending the trial court’s return to remand.
AFFIRMED AS TO CONVICTIONS; REMANDED WITH DIRECTIONS AS TO SENTENCING.
BASCHAB, P.J., and McMILLAN, WISE, and WELCH, JJ„ concur.

. In case no. CC-04-4136, Woods was also charged with and convicted of the attempted murder of Michael Collins, in violation of §§ 13A-6-2 and 13A-6-4, Ala.Code 1975. The trial court sentenced Woods to life imprisonment for the attempted-murder conviction. Woods did not file a notice of appeal with respect to that conviction; therefore, it is not before this Court in this appeal.

. By the time Officer Sanders arrived at the apartment, the officers had been shot.

. Spencer was also convicted of capital murder for his involvement in the shooting of the police officers and was sentenced to death. His appeal is currently pending in this Court and is docketed as case no. CR-04-2570.

. We note that McClure, Belser, and Scott testified before the hearing on the evidence the State proposed to admit pursuant to Rule 404(b), and that none of this testimony was discussed at that hearing.

. Woods also argues that the evidence was inadmissible because, he says, it was not a statement of general opinion or reputation evidence, but instead included statements regarding specific conduct. It is unclear from Woods’s argument whether he addresses this particular challenge to all of the evidence he discusses in this issue, or only to the exhibits discussed in this portion of the argument. Regardless of that ambiguity, we note that Woods appears to be attempting to apply Rule 405(a), Ala.R.Evid., which states that evidence of character may be made by testimony as to reputation or in the form of an opinion. None of the evidence discussed here was offered as character evidence, however, so Rule 405 is inapplicable.

. During the State’s rebuttal case at the penalty phase, the prosecutor asked Bobbie Owen what she thought the appropriate sentence would be in this case, and defense counsel objected and cited Rules 401 and 403, Ala. R.Evid. (R. 1841-42.) When the prosecutor asked the same question of Susan Bennett and Stacy Sellers, Woods did not object. Each witness testified that she thought a death sentence would be appropriate. On appeal, Woods does not raise this issue. We note, nonetheless, that the trial court acted well within its discretion to permit this testimony because during the defense case, Woods asked the witnesses what sentence they believed was appropriate and they testified that a life-imprisonment-without-parole sentence would be appropriate for him. (R. 1804, 1810-11, 1819, 1825-26.) See, e.g., Ex parte D.L.H., 806 So.2d 1190, 1193 (Ala.2001) ("When one party opens the door to otherwise inadmissible evidence, the doctrine of 'curative admissibility’ provides the opposing party with 'the right to rebut such evidence with other illegal evidence.’ McElroy's Alabama Evidence, § 14.01, p. 49 (5th ed. 1996).”). Testimony from a victim’s family member as to a sentencing recommendation is generally not admissible in a capital case. See, e.g., Stallworth v. State, 868 So.2d 1128, 1176 (Ala.Crim.App.2001). Because Woods offered such testimony at the penalty phase of his trial, however, we find that, under the facts of this case, no plain error occurred as a result of the State's witnesses’ testimony in rebuttal about a recommended sentence.

. Section 13A-5-54, Ala.Code 1975, provides that an indigent defendant in a capital-murder trial “must be provided with court appointed counsel having no less than five years’ prior experience in the active practice of criminal law.”

. In footnote 27 of his brief, Woods makes the following argument:
"As a perfect example of the arbitrary and capricious nature of the application of this law, in the Kerry Spencer case, the jury found that life without parole was the appropriate penalty (for the self-admitted shooter of the three police officers) following [t]he punishment phase. The Court (the same trial judge as in the instant case— Judge Tommy Nail) overrode the jury's verdict in Spencer and imposed a sentence of death by lethal injection.”
(Woods’s brief at pp. 71-72; emphasis added.) Woods has implicitly acknowledged that his arguments concerning the override provisions have nothing to do with his own case.